1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRIAN THOMAS, | ) | 1:05-CV-01198 LJO DLB HC |
| | ) | |
| Petitioner, | ) | FINDING AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS (DOC. 1) |
| | ) | |
| JAMES A. YATES, | ) | ORDER GRANTING RESPONDENT'S |
| | ) | MOTION IN LIMINE (Doc. 94) |
| Respondent. | ) | |
| | ) | |
| | | OBJECTIONS DUE WITHIN THIRTY (30) |
| | | DAYS |

Petitioner Brian Thomas ("Petitioner") is a state prisoner represented by counsel, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges the Governor's decision reversing the decision by the California Board of Parole Hearings ("Board") finding him suitable for parole in 2004. (Doc. 1 at 12.) Petitioner claims the Governor's decision (1) violated his federal due process rights because there was insufficient evidence to find him unsuitable for parole; and (2) violated the ex post facto clause of the Constitution, because the state constitutional provision allowing the Governor to review and reverse a Board parole determination was passed after Petitioner's 1980 offense and applied retroactively to increase the length of his sentence.[1]

On March 19, 2009, the Court ordered an evidentiary hearing in order to permit Petitioner to

---

[1] In his Petition, Petitioner additionally claimed that the Board's August 18, 1993 determination to rescind a previous grant of parole was also unlawful, however on September 21, 2007, the Court granted Respondent's motion to dismiss this claim as untimely under 28 U.S.C. § 2244(d)(1). (Doc. 19 at 8, Findings and Recommendation regarding Respondent's motion to dismiss and Doc. 21, Court's Order adopting the findings and recommendations in full.)

1  present evidence that article V, section 8(b) of the California Constitution creates a significant risk of

2  prolonging Petitioner's incarceration and therefore violates Petitioner's rights under the Ex Post Facto

3  Clause of the United States Constitution.  (Doc. No. 27.)

4       On May 10, 2011, the Court conducted the evidentiary hearing.[2]  Petitioner and Respondent

5  filed post-evidentiary hearing briefs on July 12, 2011.  (Doc. 99 and 100.)  On August 1, 2011,

6  Petitioner and Respondent filed their replies.

7                              **Background**

8       In 1982, Petitioner pleaded guilty and was convicted of one count of second degree murder,

9  California Penal Code § 187, and one count of attempted murder, California Penal Code §§ 664 and

10 187.  (Doc. 1, Petition at 3.)  He was sentenced to an indeterminate sentence of fifteen-years-to-life

11 for the second degree murder conviction.  (Id.)  In 1990, Petitioner was found suitable for parole and a

12 term was set.  (Doc. 1, Exh. F.)  On April 13, 1993, however, the Board of Prison Terms ("BPT" or

13 "parole board") scheduled a parole rescission hearing to determine whether the prior grant of parole

14 may have been improvident.  (Doc. 1, Exh. G.)  On August 18, 1993, the BPT rescinded Petitioner's

15 parole date.  (Id.)

16      Between 1993 and 2001, at five subsequent hearings, Petitioner was found unsuitable for

17 parole by the parole board.  (Respondent's ("Resp't") Lodged Doc. 104, Hearing Exhibits P-T,

18 transcripts for board hearings held January 20, 1994, February 10, 1995, May 2, 1996, May 26, 1998,

19 and May 10, 2001.)

20      In 1994, Petitioner challenged the parole board's rescission in a state petition for writ of

21 habeas corpus, filed in the Superior Court for the County of San Luis Obispo.  (Doc. 16, Exh. 1.)  The

22 Superior Court denied the petition on November 3, 1994, noting that the BPT was vested with

23 "almost unlimited" discretion and was legally authorized to "change its collective mind."  (Id.)

24      In May 2003, the BPT again found Petitioner suitable for parole; however, in October 2003,

25 then-Governor Davis reversed the parole board's decision.  (Doc. 1 at 5.)  Petitioner then commenced

26

27      _____

28      [2]In the interim period between the Court's initial order setting the hearing in March of 2009 to May 10, 2011, the date of the hearing, Respondent filed both a motion requesting the Court to reconsider its order setting the hearing (Doc. 28), and subsequently, a motion to vacate the evidentiary hearing.  (Doc. 89.)  Both motions were denied.  (Doc. 33 and 92.)

1  a "round" of state habeas proceedings, all of which were rejected, culminating in the filing of a

2  federal petition in the United States District Court for the Central District of California.  (Doc. 1 at 6.)

3  In that case, Petitioner challenged Governor Davis's 2003 reversal of the BPT's determination as well

4  as the 1993 rescission of the parole board's 1990 parole decision, however the case has now since

5  been dismissed as moot.  (Thomas v. Yates, Civ. No. 2:05-01194 GAF-CW, (C.D. Mar. 9, 2011)

6  (Doc. 19, order dismissing the case.)

7          During the pendency of those proceedings,  Petitioner once again appeared before the BPT on

8  June 30, 2004, and the parole board again found Petitioner suitable for parole.  (Doc. 1 at 12.)

9  However, again, the governor, former Governor Schwarzenegger, reversed the BPT's decision in

10 November 2004.  (Id.)  Petitioner then commenced a "round" of state habeas proceedings regarding

11 the 2004 reversal.  On March 11, 2005, Petitioner filed the first state court petition regarding the

12 instant case, contending that Governor Schwarzenegger's reversal was not supported by "some

13 evidence," and that the 1993 rescission was unlawful.  (Doc. 16, Exh. 3.)  On May 10, 2005, the

14 Superior Court denied the petition, finding that "some evidence" supported the Governor's decision.

15 (Id.)  The court also rejected Petitioner's claim regarding the 1993 rescission on the grounds that it

16 was not timely filed, citing In re Clark, 5 Cal.4th 750, 785, 786 (1993).  (Id. at 4.)  Petitioner then

17 filed a habeas petition in the California Court of Appeal, Second Appellate District, raising the same

18 issues.  (Doc. 16, Exh. 5.)  The appellate court denied the petition on June 7, 2005.  (Id., Exh. 6.)

19 Petitioner then filed a petition for review in the California Supreme Court that was denied on August

20 31, 2005.  (Id., Exh. 6.)  On September 19, 2005, Petitioner filed the instant federal petition.  (Doc. 1.)

21          Between 2005 and 2007, two additional hearings were held and on both occasions, the Parole

22 Board found Petitioner unsuitable for parole.  (Resp't Lodged Doc. 104, Exhs. Y & Z.)  On

23 November 5, 2008, at a subsequent parole consideration hearing, the Parole Board found Petitioner

24 suitable for parole and Former Governor Schwarzenegger declined to review the Parole Board's

25 decision.  (Doc. 29 at 2.)  On April 29, 2009, Petitioner was released on parole.  (Doc. 29 at 1.)

26 ////

27 /////

28

1                                                **Discussion**

2  **I.       Jurisdiction and Venue**

3          A person in custody pursuant to the judgment of a state court may file a petition for a writ of

4  habeas corpus in the United States district courts if the custody is in violation of the Constitution or

5  laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v.</u>

6  <u>Taylor</u>, 529 U.S. 362, 375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

7  guaranteed by the United States Constitution.  Though Petitioner was released on parole on April 9,

8  2009, at the time he filed his petition, Petitioner, was incarcerated at the Pleasant Valley State Prison

9  in Coalinga, California, which is located in Fresno County.  As Fresno County falls within this

10  judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of

11  habeas corpus.  <u>See</u> 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of

12  habeas corpus to the district court where the petitioner is currently in custody or the district court in

13  which a State court convicted and sentenced Petitioner if the State "contains two or more Federal

14  judicial districts").

15  **II.       Standard of Review**

16          On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

17  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

18  enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326-27 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

19  (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently

20  governed by its provisions.  <u>See Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003).  Thus, the petition "may

21  be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary

22  to, or involved an unreasonable application of, clearly established Federal law, as determined by the

23  Supreme Court of the United States.'"  <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28

24  U.S.C. § 2254(d)(1))<u>, overruled in part on other grounds</u>, <u>Hayward v. Marshall</u>, 603 F.3d 546, 555

25  (9th Cir. 2010) (en banc); <u>see Lockyer</u>, 538 U.S. at 70-71.

26          Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's

27  habeas petition as Petitioner is in the custody of the California Department of Corrections and

28  Rehabilitation pursuant to a state court judgment.  <u>See Sass v. California Board of Prison Terms</u>, 461

1  F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward, 603 F.3d at 555.  As

2  a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as

3  determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71 (quoting 28 U.S.C.

4  § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the

5  "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant

6  state-court decision." Id. (quoting Williams, 529 U.S. at 412).  "In other words, 'clearly established

7  Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme

8  Court at the time the state court renders its decision."  Id.  Finally, this Court must consider whether

9  the state court's decision was "contrary to, or involved an unreasonable application of, clearly

10 established Federal law."  Id. at 72 (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause,

11 a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that

12 reached by [the Supreme] Court on a question of law or if the state court decides a case differently

13 than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413; see

14 also Lockyer, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court

15 may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

16 decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529

17 U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its

18 independent judgment that the relevant state court decision applied clearly established federal law

19 erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal

20 habeas court making the "unreasonable application" inquiry should ask whether the State court's

21 application of clearly established federal law was "objectively unreasonable." Id. at 409.

22      Petitioner bears the burden of establishing that the state court's decision is contrary to or

23 involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

24 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth

25 Circuit precedent remains relevant persuasive authority in determining whether a state court decision

26 is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the

27 Supreme Court's precedents are binding on the Arizona court, and only those precedents need be

28 reasonably applied, we may look for guidance to circuit precedents"); Duhaime v. Ducharme, 200

1   F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it can no longer

2   reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a

3   federal Constitutional issue. . . .  This does not mean that Ninth Circuit case law is never relevant to a

4   habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining

5   whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and

6   also may help us determine what law is 'clearly established'").  Furthermore, the AEDPA requires

7   that the Court give considerable deference to state court decisions.  The state court's factual findings

8   are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is bound by a state's

9   interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002).

10          The initial step in applying AEDPA's standards is to "identify the state court decision that is

11   appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

12   than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

13   reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption that

14   later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

15   ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

16   state court decisions to the last reasoned decision to determine whether that decision was contrary to

17   or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107, 1112-

18   13 (9th Cir. 2003).  Petitioner raised his claims through a writ of habeas corpus filed with the Los

19   Angeles County Superior Court, the California Court of Appeal and the California Supreme Court.

20   Following the Superior Court's issuance of its reasoned decision, both the California Court of Appeal

21   and the California Supreme Court issued summary denials of Petitioner's claims.  Therefore, the

22   Court "look[s] through" those decisions to the last reasoned decision; in this case, that of the Los

23   Angeles County Superior Court.  See Nunnemaker, 501 U.S. at 804.

24   **III.     Review of Petitioner's Claims**

25          **A.     Due Process Claim**

26          In his petition, Petitioner claims that the Governor's 2004 decision to deny parole was not

27   supported by sufficient evidence that petitioner posed a threat to public safety, in violation of

28   petitioner's Fourteenth Amendment right to due process. (Doc. 1 at 15-18.)

1    Since the filing of the petition, this area of federal habeas law has been changed substantially

2  by the U.S. Supreme Court's decision in Swarthout v. Cooke, —— U.S. ——, —— – ——, 131 S.Ct.

3  859, 862–863, 178 L.Ed.2d 732.  In Swarthout, the Supreme Court reviewed two cases in which

4  California prisoners were denied parole—in one case by the Board, and in the other by the Governor

5  after the Board had granted parole.  Id. at 860–61.  The Supreme Court noted that when state law

6  creates a liberty interest, the Due Process Clause of the Fourteenth Amendment requires fair

7  procedures, "and federal courts will review the application of those constitutionally required

8  procedures."  Id. at 862. The Court concluded that in the parole context, however, "the procedures

9  required are minimal" and that the "Constitution does not require more" than "an opportunity to be

10  heard" and being "provided a statement of the reasons why parole was denied."  Id.  The Supreme

11  Court therefore rejected Ninth Circuit decisions that went beyond these minimal procedural

12  requirements and "reviewed the state courts' decisions on the merits and concluded that they had

13  unreasonably determined the facts in light of the evidence."  Swarthout, 131 S.Ct. at 862.  In

14  particular, the Supreme Court rejected the application of the "some evidence" standard to parole

15  decisions by the California courts as a component of the federal due process standard.  Id. at 862–863.

16    In Petitioner's post hearing brief, Petitioner's counsel acknowledges that, in the wake of

17  Swarthout, Petitioner's due process claim is a "foregone conclusion" and concedes that the Court will

18  likely deny this claim.  (Doc. 100 at 11.)  Petitioner is correct as it is clear that he was afforded the

19  required "minimal protections."  Swarthout, 131 S.Ct. at 862.  Consequently, the Court finds that

20  Petitioner is not entitled to habeas corpus relief on this ground.

21        **B.    Petitioner's Ex Post Facto Claim**

22    Petitioner contends that article V, section 8(b) of the California Constitution, pursuant to

23  which the Governor may reverse parole board decisions granting certain prisoners parole, violates the

24  Ex Post Facto Clause of the United States Constitution.  The Governor has exercised his power under

25  article V, section 8(b) to reverse two separate grants of parole to Petitioner.

26    The Ex Post Facto Clause of the United States Constitution prohibits the states from enacting

27  retroactive laws that increase the punishment for a crime after its commission.  U.S. Const., Art. I §

28  10; e.g., Garner v. Jones, 529 U.S. 244, 249-50 (2000) (citing Collins v. Youngblood, 497 U.S. 37, 42

1 (1990)).  Even facially neutral laws that are procedural in nature may violate the Ex Post Facto

2 Clause.  See, e.g., id. ("not every retroactive procedural change creating a risk of affecting an inmates

3 terms or conditions of confinement is prohibited"); see also Collins, 497 U.S. at 46 ("labeling a law

4 'procedural'. . . does not thereby immunize it from scrutiny under the Ex Post Facto Clause").

5      In the parole context, a prisoner may demonstrate an ex post facto violation by establishing

6 that, as applied to him, a retroactive parole law "creates a significant risk of prolonging [his]

7 incarceration."  Garner, 529 U.S. at 250 (citing Lynce v. Mathis, 519 U.S. 433, 445-46 (1925));

8 Brown v. Palmateer, 379 F.3d 1089, 1095 (9th Cir. 2004).  In Garner, the Supreme Court established

9 that whether a retroactive parole law violates the Ex Post Facto Clause depends on the manner in

10 which the law is applied to the prisoner challenging its application.  Garner, 529 U.S. at 256-57.

11 "When the rule does not by its own terms show a significant risk, the [prisoner] must demonstrate, by

12 evidence drawn from the rule's practical implementation by the agency charged with exercising

13 discretion, that its retroactive application will result in a longer period of incarceration than under the

14 earlier rule."  Id.  Ex post facto analysis of a facially neutral parole law requires a case-specific, fact-

15 intensive analysis regarding the risk posed by the law to the particular prisoner challenging its

16 application.  See, e.g., Id. (prisoner "must show that as applied to *his own* sentence the law created a

17 significant risk of increasing his punishment") (emphasis added); Brown, 379 F.3d at 1095 (same).[3]

18      In addition to imposing a new, substantive standard for evaluating ex post facto claims in the

19 parole context, the Supreme Court's decision in Garner revealed the importance of affording a

20 prisoner the opportunity to obtain discovery.  Garner, 529 U.S. at 257.  Although the Supreme Court

21 noted that the proper scope of discovery lies within the discretion of the district courts, it identified

22 two types of information that are generally relevant to ex post facto inquiries: 1) internal policies

23 regarding implementation of the challenged statute by the agency charged with implementing the

24 statute; and 2) data reflecting the real-world operation of the challenged statute.  Id. at 255-57.

25

26

27

28      [3]Noting that multiple courts of appeal that have confronted ex post facto challenges to parole statutes post-Garner have held that Garner requires an as-applied analysis, the Court's June 17, 2009 order found that Garner required an as-applied analysis.  (Doc. 33 at 11-13.)

1

### 1.    The State Court Decision

Petitioner presented the essential facts underlying his ex post facto claim to the state court by

establishing that the Governor reversed two grants of parole to Petitioner pursuant to a retroactive

statute.  (Doc. 24, Answer, Ex. E at 27-28.)  In his state habeas petition before the Superior Court,

Petitioner averred:

> Imposition of a new obstacle to his parole, almost certain gubernatorial reversal, which
> has extended his prison term. . . and has extinguished two valid grants of petitioner's
> parole by BPT to date, constitutes a classic example of ex post facto. (Citations)

Id.  Petitioner presented his parole history, the transcript of his 2004 parole hearing, the Governor's

reversal letter, and an internal CDCR memo concerning the Governor's practice of reviewing parole

grants, but not parole denials, as evidence that article V, section 8(b) presented a risk of prolonging

Petitioner's incarceration.  This evidence was sufficient to establish a prima facie ex post facto claim,

as the standard for establishing such a claim is relatively low.[4]

Despite the fact that Petitioner presented a prima facie ex post facto claim, the State's

Superior court held that Petitioner's claim was foreclosed as a matter of law by In re Rosenkrantz, 29

Cal.4th 616, 691 (Cal. 2002).[5]  In Rosenkrantz, the California Supreme Court reviewed a claim

comparable to Petitioner's claim and found that Article V, section 8(b), did not violate the Ex Post

Facto Clause.  In its analysis, the Rosenkrantz Court discussed Garner but held that the statute at issue

in Garner was distinguishable from section V, article 8(b) because the statute in Garner addressed

changes in the availability and frequency of parole hearings, and not changes in who made the final

decisions in parole proceedings.  Id. at 644.  It is clear, however, that the California Supreme Court in

Rosenkrantz did not conduct an as-applied analysis:

---

[4]Garner established that the threshold for establishing a possible ex post facto violation is relatively low.  See Garner
v. Jones, 529 U.S. at 257 (Remanding the case to the district court to permit the prisoner to obtain evidence through discovery
which might reveal "whether the amendment to Rule 475-3-.05(2), *in its operation*, created a significant risk of increased
punishment for [the prisoner].").

[5]The Superior Court devoted two sentences to Petitioner's ex post facto claim: "the Court rejects the remainder of
petitioner's arguments including that the Governor's reversal constitutes an ex post facto violation. . .the court has already
concluded that the Governor's review does not amount to an ex post facto violation.  (*Rosenkrantz*, supra, at 637-652)." See
Answer, Ex. F.

At the outset, we observe that petitioner is not in the best position to claim that article V, section 8(b), has worked unfairly to his disadvantage by permitting the Governor to substitute his determination as to petitioner's suitability for parole for the evaluation of petitioner's suitability reached by the Board.  As the factual recitation set forth above indicates, in this case the Board, exercising its own judgment and discretion, determined--largely on the basis of the nature and circumstances of the offense--that petitioner was not yet suitable for parole.  It was only under the compulsion of the appellate court's decision in Rosenkrantz II, supra, 80 Cal. App. 4th 409, finding that the Board's decision denying parole was not supported by any evidence and ordering the Board--under the threat of contempt--to grant parole, that the Board ultimately issued a decision granting parole to petitioner.  Accordingly, from a realistic perspective, petitioner cannot maintain persuasively that in this instance article V, section 8(b), has resulted in the denial of parole of an individual whom the Board, in the exercise of its independent judgment, has determined is suitable for parole.

Rosenkrantz, 29 Cal.4th at 637-38 (emphasis added).  Because the California Supreme Court did not, in keeping with Garner, conduct an as-applied analysis, this Court previously determined that the superior court's reliance on Rosenkrantz to reject Petitioner's ex post facto claim and similarly circumvent the required as-applied analysis, was contrary to, or involved an unreasonable application of federal law.  (Doc. 33 at 9-10.)

In light of the above analysis, on June 17, 2009, this Court reordered evidentiary hearing in order to assess evidence relevant to the as-applied analysis required by Garner, on June 17, 2009. (Doc. 33 at 22); see also Frantz v. Hazey, 533 F.3d 724, 745 (9th Cir. 2008) (where state court concluded, erroneously, that no facts were required to resolve petitioner's claim, federal habeas court required to hold an evidentiary hearing).

> ### 2. Motions in Limine and Respondent's Request to Strike Petitioner's Exh. 24

Prior to the evidentiary hearing, Respondent filed its Motions in Limine (MILs).  (Doc. 94, Respondent's Motion in Limine ("Resp't MIL")).  On May 3, 2011, Petitioner filed his opposition and on May 5, 2011, Respondent filed its Reply.  (Docs. 95 and 96.)

Respondent's MIL objects to the introduction of three of Petitioner's Exhibits:  (1) Exhibit 14, "Declaration of Petitioner's Counsel regarding federal court review of gubernatorial reversals of parole"; (2) Exhibit 15, a report by the United States Department of Justice on habeas litigation in the district courts; and (3) Exhibit 21, Former Governor Scharzenegger's decision commuting Estaban Nunez's prison sentence.  (Doc. 94, Resp't MIL.)  Additionally, Petitioner's post hearing brief

1  additionally provided Exhibit 24, excerpts from a 2001 deposition of Albert Leddy, which

2  Respondent contends must be stricken from the record.  (Doc. 101 at 10-11.)

3              **a.       Respondents MIL to Petitioner's Exh. 14 and 15.**

4        Exhibit 14 consists of counsel's declaration which provides a list of federal opinions

5  addressing gubernatorial reversals of parole under the "some evidence" standard.  (Petitioner's

6  ("Pet's") Lodged Doc. 103, Exh. 14.)  According to Petitioner's Counsel, the research indicates that

7  in forty of the seventy habeas cases (or approximately sixty-three percent of the cases), the magistrate

8  or district judge found no evidence supported the Governor's decision and granted relief.  (Doc. 95,

9  Opp to MIL.)  Petitioner's Exhibit 15 is a Report by the United States Department of Justice on

10 habeas litigation in the district courts, which includes data that reflects the outcome, (either grants or

11 denials of claims) from federal habeas non-capital filings with conviction error claims, ie. cases which

12 do involve the governor's reversal of a grant of parole.  (Pet's Lodged Doc. 103, Exh. 15.)

13 Petitioner's Counsel argues that these two sets of data are offered to contrast the different rates of

14 habeas relief for the two different types of claims.  (Doc. 95.)  More specifically, he asserts that

15 comparing decisions involving the governor's review of parole grants, (Exh. 14), where relief was

16 frequently provided to the more general set of habeas cases, (Exh. 15), where relief was provided only

17 infrequently, suggests the Governor was not following his "statutory commands."  (Doc. 100 at 34.)

18        Respondent's motion argues the declaration at Exhibit 14 is irrelevant because the cases

19 reviewed in the declaration do not address the specific issue before the Court, ie. Petitioner's "as

20 applied" ex post facto challenge.  (Doc. 94 at 2-3.)  Additionally, Respondent contends the research is

21 flawed because the cases provided are still yet unresolved or were resolved differently then Petitioner

22 suggests.  (Id. at 2-3.)  As to Petitioner's Exh. 15, Respondent argues that nothing in the content of the

23 report is relevant to Petitioner's Ex Post Facto Claim.[6]  (Id. at 3-4.)

24        "Although relevant, evidence may be excluded if its probative value is substantially

25 outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

26 consideration of the issues, or delay, waste of time, or needless presentation of cumulative evidence."

27 ───────────────

28        [6]In Respondent's motion in limine at page 3, he incorrectly refers to Exhibit 15 as Exhibit 14, but correctly addresses the exhibit as the "executive case summary of a report on federal habeas litigation." (Doc. 94, Resp't MIL at 3.)

1   Rule 403.  "A district court is accorded wide discretion in determining the admissibility of evidence

2   under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any

3   factors counseling against admissibility is a matter first for the district court's sound judgment under

4   Rules 401 and 403 . . . . " United States v. Abel, 469 U.S. 45, 54 (1984); see Boyd v. City and County

5   of San Francisco, 576 F.3d 938, 948 (9th Cir. 2009).

6          The Court finds Petitioner's Exhibits 14 and 15 are simply not relevant to the resolution of

7   Petitioner's claim.  While the cases cited in Exhibit 14 reflect the opinions of magistrate and district

8   court judges regarding whether the governor's decisions resulted in violations of due process, they are

9   not relevant to a determination of whether the governor followed state law or the relevant statutory

10  mandate at issue in this case.  Similarly, the comparison of Exhibits 14 and 15 suggested by

11  Petitioner, is not meaningful or relevant to the resolution of Petitioner's claim.  Accordingly, the

12  Court GRANTS Respondent's MIL regarding Petitioner's Exhibits 14 and 15.

13                    **b.  Respondents MIL to Exh. 21.**

14         Respondent's third MIL objects to Petitioner's Exh. 21, a document reflecting former

15  Governor Scharzenegger's decision commuting Estaban Nunez's prison sentence.  (Pet's Lodged

16  Doc. 103, Exh. 21.)  Petitioner asserts that after the governor issued his decision commuting another

17  Estaban Nunez's sentence, (another prisoner in a different case unrelated to the Petitioner's case) he

18  later admitted that he had been motivated to commute Nunez's sentence, because he wanted to "help

19  a friend."  (Doc. 95, Opp to MIL at 10.)  Petitioner argues that because in the Nunez case, the

20  Governor's written justification concealed the "real justification," it makes it more likely that the

21  Governor's written decision reversing Petitioner's parole grant, similarly concealed the real

22  justification which was, to "satisfy his political supporters."  (Doc. 95, Opp to MIL at 10-11.)

23         Respondent argues that the Governor's decision to commute Nunez's sentence was made

24  "pursuant to a completely different and distinguishable power of the Governor," (California

25  Constitution, article V, section 8(a)) and is unrelated to Petitioner's Ex Post Facto Claim and

26  therefore irrelevant.  (Doc. 94, Resp't MIL at 4.)

27         The Court finds that Petitioner assertions are speculative because even if the Governor stated

28  that he made the decision in Nunez to "help a friend," this does not mean the Governor could not

1    have also based his decision on the law's required factors.  More importantly there appears no nexus

2    between the Governor's decision in Nunez and the Governor's decision to reverse Petitioner's parole

3    grants.  Consequently, the Court GRANTS Respondent's third MIL regarding Petitioner's Exhibit 21.

                        c.        **Respondent's Objection to Petitioner's Exhibit 24**

5           Following the hearing, Petitioner provided his post-evidentiary brief with additional attached

6    transcript, (excerpts from a 2001 Deposition of Albert Leddy) marked as Exhibit 24.  (Doc. 100, Pet's

7    Brief, Exh. 24.)  In its post-evidentiary hearing reply brief, Respondent requests Petitioner's Exhibit

8    24 be stricken from the record.  (Doc. 101, Resp't Reply at 10-11.)

9           Petitioner provided the deposition to address Respondent's evidence, adduced at hearing,

10   which suggested Petitioner's 1990 grant of parole was rescinded by a panel of the Parole Board and

11   not by the Governor.  (Resp't Lodged Doc. 104, Exh. O, Transcript of Board Panel Hearing

12   rescinding Petitioner's grant, July 27, 1993.)  Petitioner asserts that deposition excerpt provided at

13   Exhibit 24 demonstrates that former Governor Wilson made it known to the Parole Board that he

14   wanted the rescission of all parole grants already conferred.  (Doc. 100, Pet's Brief at 9.)

15          Petitioner's deposition excerpt does not identify who conducted the 2001 deposition, and it is

16   unclear as to who was present at the deposition, other than Mr. Leddy.  Additionally, as Respondent

17   points out, Respondent did not have the benefit of questioning Mr. Leddy.  Additionally, the Court

18   notes that Petitioner's counsel did not seek to introduce the deposition into evidence at hearing.

19          The Court construes Petitioner's post-hearing brief's inclusion of the Leddy Deposition as a

20   request to reopen the record.  A motion to reopen the record to submit additional evidence is

21   addressed to the sound discretion of the Court.  Zenith Radio Corp. v. Hazeltine Research, Inc., 401

22   U.S. 321, 331 (1971) (citations omitted).  "[T]he particular criteria that guide a trial court's decision to

23   reopen are necessarily flexible and case-specific. . . ."  Rivera-Flores v. Puerto Rico Telephone Co.,

24   64 F.3d 742, 746 (1st Cir.1995).  The Court should consider whether: "(1) [T]he evidence sought to

25   be introduced is especially important and probative; (2) the moving party's explanation for failing to

26   introduce the evidence earlier is bona fide; and (3) reopening will cause no undue prejudice to the

27   nonmoving party."  Id. (citations omitted).

28          Courts generally act within their discretion in refusing to reopen a case for cumulative

1  evidence or evidence with little probative value.  Id. (citing Joseph v. Terminix Int'l Co., 17 F.3d

2  1282, 1285 (10th Cir.1994); Thomas v. SS Santa Mercedes, 572 F.2d 1331, 1336 (9th Cir.1978)).  In

3  Thomas, the Ninth Circuit found that the trial court acted within its discretion in denying a motion to

4  reopen to hear new evidence that "does not have the persuasive power [appellant] claims for it."

5  Thomas, 572 F.2d at 1336.

6       Here, the Court finds that Petitioner was not diligent in seeking to expand the record after the

7  close of evidence and offers no explanation for failing to introduce the evidence earlier.  The

8  deposition excerpts do not indicate whether the deposition was provided under oath or was signed and

9  reviewed.  More to the point, the content of the deposition is not important or probative to the issues

10  presented and appear unrelated to the Petitioner's challenge of the Governor's November 15, 2004

11  decision to reverse the Board's 2004 decision on ex post facto grounds.  In addition, this point is only

12  underscored by Petitioner's admissions that he has not "firmly established the Governor's

13  responsibility for the 1993 rescission" and that the relevant point is whether through the Governor's

14  intervention or not, "a hearing panel [in 1990] found him suitable for parole."  (Doc. 100, Pet's Brief

15  at 10.)

16       In light of these findings, the Court GRANTS Respondent's request to strike Petitioner's

17  Exhibit 24 from the record.

18          **3.       Evidence presented at hearing**

19              **a.       Governor's 1991 letter**

20       In support of his contention that the Governor's office had a policy of reviewing only grants of

21  parole, Petitioner provided a 1991 letter sent from the Governor's office to the Chairman of the Board

22  of Prison Terms which documents an agreement made between the Governor's office and the Parole

23  Board regarding the forwarding of parole grants.  (Pet's Lodged Doc. 103, Exh. 19.)  According to

24  this agreement, the Board was to provide to the Governor's office "all cases involving murder" where

25  the board had provided a proposed grant or "an advancement of an existing grant."  (Id.)  The letter

26  does not provide any instruction to the board regarding parole denials, however, pursuant to this

27  policy and according to the uncontested data, the governor reviewed only 2 denials of parole from

28  1991 to 2008.  (Pet's Lodged Doc. 103, Exh. 2.)

**b.     Gubernatorial decision making data**

At hearing, Petitioner's expert, Professor Eileen Zurbriggen, a professor of psychology at the University of California, Santa Cruz, testified regarding her review and analysis of multiple data sets reflecting the results of gubernatorial decision making for those prisoners with murder commitments where the Parole Board had previously provided grants of parole.  The data presented at hearing was extracted from the Governor's Legislative Reports reflecting the results of the Governor's reviews over the years ranging from 1991 to 2008.  (Pet's Lodged Doc. 103, Exh. 3.)  Petitioner focuses his arguments on the data presented for three distinct periods: (1) from 1991 to 2003, represented the 13-year period extending from the time the Governor began to exercise his parole-review authority to the year prior to Petitioner's parole-grant reversal at issue in the instant case; (2) that data representing the Governor's decisions in 2004, the year the Governor reversed Petitioner's grant of parole; and (3) data reflecting the Governors' decision making for 2005 through 2008, the years immediately following the Governor's decision to reverse Petitioner's grant of parole.  (Pet's Lodged Doc. 103, Exh. 3; <u>see</u> Doc. 100, Pet's Brief at 23-24.)

Excluding, those decisions that were returned by the Governor to the Board for further review, ie. those decisions which potentially negatively impacted a given prisoner but did not represent true reversals, reflect the following:  (1)  between 1991 and 2003, of the 366 parole grants[7] reviewed, the Governor reversed 292 of these for an approximate rate of 80 percent; (2)  in 2004, with 207 parole grants reviewed, the Governor reversed 128 of these for an approximate rate of 62 percent rate[8]; and (3)  between 2005 and 2008, with 615 parole grants reviewed, the Governor reversed 460 times, for an approximate rate of 75 percent.    (Pet's Lodged Doc. 103, Exh. 3; <u>see</u> Doc. 100, Pet's Brief at 23-

---

[7]The totals represented by the chart lodged at hearing reflect a total of 463 grants reviewed by the Governors between 1991 to 2003 and subtracting out the 95 decisions which were sent for further review, yields a figure of 368 and not 366, however this minor adjustment to Petitioner's totals is of no significance to Petitioner's contentions. (Pet's Lodged Doc. 103, Exh. 3; <u>see</u> Doc. 100, Pet's Brief at 23-24.)

[8]To arrive at the 207 number used as the total parole grants reviewed in 2004, Petitioner subtracts those decisions which the Governor sent back for further review, to further "focus" on the issue in this case. (Doc. 100 at 23-24.) However, the table reflects that of the 18 decisions sent back for further review, none of these decisions were later modified, so presumably, the decisions were not ultimately reversed by either decision maker.  Thus it is unclear why it is necessary to subtract the 18 decisions from the total number reviewed.  With this approach, it appears equally logical to utilize the 225 figure for consideration, albeit this reflects an only marginal difference in the two rates of reversal, a rate of reversal of 57 percent (128 reversals divided by the 225 decisions), versus Petitioner's derived figure of 62 percent.

24.)  Professor Zurbriggen testified that based on her analysis of the data sets, the Governor implementation of his parole-review authority was non-neutral, ie. statistically significant or not merely the result of chance.  (Doc. 98, Reporter's Transcript ("RT") at 26-27.)

### c.  Term lengths before and after the exercise of the Governor's review authority[9]

In addition to the rate of reversals, Petitioner also presented data examining the length of incarceration for parole-eligible prisoners with murder commitments before and after the implementation, 1991, of article V, section 8(b).  Petitioner's contends that after 1991, "the mean and median times for inmates with murder commitments became significantly greater and that at least part of the explanation for that term-lengthening was the manner in which the Governor intervened in parole decisionmaking."  (Doc. 100, Pet's Brief at 31.)  At hearing, the Court questioned Petitioner's expert regarding whether she had been able to control for various extrinsic factors which could have also accounted for or impacted the increase in the term lengths.  (Doc. 98, RT at 49-50.)  Included in these extrinsic factors were enhancements for personally being armed with a firearm, increased sentences for prior convictions, California's three strikes law, the public as well as the Parole Board's attitude towards sentencing and Parole.  (Doc. 98, RT at 49-50.)  In response, Professor Zurbriggen admitted the data was "messy" and though she could agree that the high volume of governor reversals had contributed to the longer terms, she admitted that, without being able to control for such factors, she could not determine the extent of the contribution of the Governor's reversals to the increases in prison terms served. (Id.)

---

[9]Additionally, Petitioner's expert opined that  it was unlikely that the Parole Board made a mistake three times in a row in providing Petitioner's grant of parole, where two of the three grants, (the grants provided in 2003 and 2004) were overturned by the governor, suggesting that the governor's decision making was exercised in a non-neutral manner.  (Doc. 98, RT at 65-66.)  In support of this contention, Professor Zurbriggen suggested a hypothetical scenario that first presumed that a board could be correct, (ie. for example, where a release was granted, the parolee did not go on to commit another crime) at least fifty percent of the time, and then determined, based on the presumption, the total probability that board would be wrong three times in a row. The expert analogized the scenario as approximating the chance and probability of flipping a coin three times and coming up heads three times in a row, ie. the probability of each independent occurrence multiplied together, in other words .5 X .5 X .5 for total probability 12.5 percent.  However, because Petitioner's moving papers do not refer to this discussion and because at hearing the expert herself indicated that the hypothetical itself was based on unknown information with regards to what constituted a mistake by the board, the Court gives little weight to the expert's testimony in this regard.

1
2
3

        **d.**        **Comparison of federal decisions reviewing the Governor's decisions to reverse against reversal decisions with a generalized subset of habeas cases**[10]

4
5
6
7
8
9
10

At hearing, Petitioner provided a list of sixty nine federal district court decisions where in thirty one of the decisions, the federal judge or magistrate found that the Governor decision to reverse the board's grant of parole violated then existing federal due process standards.  (Doc. 98, RT at 75-76.)  Petitioner then asserted that by comparing these sixty nine federal decisions to cases where relief was granted in a more generalized subset of habeas cases, (involving other constitutional errors, errors at trial etc.) demonstrated that the Governor in exercising his authority, had been unfaithful to his statutory command in reversing Petitioner's parole grant.

11

        **4.**        **Parties Contentions**

12
13
14
15
16
17
18
19
20
21

Petitioner contends that his record of parole itself, independent of the statistics and data presented at hearing reflects that he was an "ideal parole candidate" who, "would have been paroled absent the Governor's reversal."  (Doc. 100 at 10-11, 12-20.)  In this regard, Petitioner asserts that he is not requesting the Court to evaluate his record of parole to determine whether the Governor's decision comported with due process, but instead offers Petitioner's record to support its assertion that had the board been the final arbitrator, Petitioner would have been paroled.  (Id.)  Beyond Petitioner's parole record, Petitioner additionally asserts that data for various years reflecting the outcomes of the governor's decision making process, supports the conclusion that the Governor's review was "preferential towards one conclusion," to extend "prisoners' terms of incarceration."  (Doc. 100 at 25.)

22
23
24
25
26

With regards to the data reflecting the inmates term lengths before and after the Governor began reviewing parole decisions, Petitioner appears to concede that the "messiness" of the data caused by other extrinsic factors not controlled for by its expert.  Nonetheless, Petitioner asserts that lengthening of the terms after the Governor exercised the relevant authority, is due, at least in some measure, to the Governor's parole review.  (Doc. 100 at 26-28.)

27

----

28

[10]Though the Court granted Respondent's motion in limine regarding Petitioner's Exhibit 14 and 15, the sources of this data, the Court's will address Petitioner's assertions presented at hearing related to this information.

1    Regarding the federal court habeas decisions reviewing the Governor reversals of parole,

2    Petitioner contends that the decisions granting relief in these cases demonstrate that the Governor

3    "was not following his statutory commands . . ." and that the large number of federal decisions which

4    reversed the governors' decisions provide further evidence that Petitioner "faced a significant risk of

5    lengthened incarceration in 2004, when, after satisfying the Board, he then had to confront" the

6    Governor's review.  (Doc. 100 at 33.)

7    Addressing Petitioner's argument that his record itself supports his ex post facto claim,

8    Respondent argues that Petitioner's subjective belief's as to his status as an "ideal" parole candidate,

9    is merely Petitioner's effort to "bootstrap a due process claim" already "adjudicated by the state

10   courts," to his ex post facto claim, an analysis foreclosed by the Supreme Court's decision in

11   Swarthout.

12   Though conceding that the governor's office had a long-standing practice or process where the

13   Board sent the Governor only cases in which the Board had found an inmate suitable for parole,

14   Respondents asserts that the decision making data show only that the Governor, "disagreed with the

15   Board." (Doc. 99 at 12-13.)  In addition, Respondent contends that Petitioner's assertion that as a

16   result of the new law providing the Governor's review, Petitioner faced "a significant risk" of

17   prolonged incarceration is unsupported by the record and rests on "mere speculation."  (Doc. 101 at 2-

18   3.)

19   Responding to the expert's comparison of term lengths before and after the Governor was

20   afforded his review authority, Respondent contends that the analysis did not account for a number of

21   variables and factors unrelated to the Governor's review authority.  (Doc. 99 at 19.)

22        **5.    Analysis**

23   As stated above in order to prevail on his "as applied" challenge Petitioner must demonstrate

24   that "as applied to his own sentence," article V, section 8(b) created a significant risk of increasing his

25   punishment.  Garner, 529 U.S. at 255-257.  In light of this guidance and after careful consideration of

26   all of the evidence presented at hearing, the Court finds that Petitioner has not provided sufficient

27   evidence in support of his ex post facto claim.

28   Starting with Petitioner's comparison of term lengths provided before and after the Governor

commenced his review of parole grants, by Petitioner' own expert's admission, the comparison

involved "messy" data because of a number of extrinsic factors were not accounted for.  (Doc. 98, RT

at 49-50.)  As the Court noted at hearing, among these factors, the state legislature substantially

changed the landscape of applicable sentencing law with enhancements for those personally armed

with a firearm, increased sentences for prior convictions, and perhaps most notably, the enactment of

California's three strikes law.[11]  (Doc. 98, RT at 49-50.)  In response to the Court's concerns, the

expert noted that though she believed the Governor's reversals had contributed to the longer terms,

she admitted that, without being able to control for such factors, she could not determine the extent of

the contribution served by the Governor's reversal authority to the increased length of prison terms.

(Doc. 98, RT at 49-51.)  In light of this discussion the Court accords little to no weight for

Petitioner's comparison data.

Additionally, the Court finds Petitioner's proffered federal and state court citations similarly

unpersuasive.  Not only do many of the cases cited by Petitioner not represent the reviewing court's

final judgement, the Court finds the state and federal opinions are simply not relevant to Petitioner's

claim.  This is true because whether a state or federal court reviewing the governor's decision found

the decision comported with either federal or state due process requirements is not determinative of

whether Article V, section 8(b) "as applied" to Petitioner, presented a "significant risk" of prolonging

Petitioner's incarceration.  These opinions instead reflect disagreement between appropriate decision

makers and the courts regarding whether, in each case, there was "some evidence" of current

dangerousness to support the inmates continued incarceration or not.

Similarly, the Court finds Petitioner's argument that his record of parole itself demonstrates he

would have been released absent the Governor's reversal also unavailing, as a fair reading of the

Board's numerous but inconsistent decisions regarding Petitioner status, discussed in further detail

below, not only do not reflect Petitioner's status as a "model parole candidate," but instead indicates

---

[11]The Court's concern at hearing regarding the legislature's various independent efforts to increase sentences is supported by multiple research articles discussing the topic.  One article providing analysis of relevant legislature changes made in California sentencing and parole statutes is Kara Dansky, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California Prison Conditions, Understanding California Sentencing, 43 U.S.F.L. Rev. 45 (2008) (author noting it had "found at least eighty substantive increases in sentencing between the DSL's enactment in 1976 and 2006 contained only in Penal Code sections 1170 and 12022.

1  the difficulty faced by the Board in attempting to balance a multitude of factors in reaching its

2  decisions.

3        As for Petitioner's statistics provided for 1991 through 2003 which indicate the Governor

4  maintained an eighty percent rate of reversal, the Court notes that Petitioner's thirteen year average in

5  isolation, does appear supportive of Petitioner's position.  Nevertheless, as the Ninth Circuit has

6  recognized, "[w]hether or not a legislative adjustment creates a 'sufficient' rather than an 'attenuated'

7  risk of increased punishment is largely 'a matter of degree,'" and the Court finds that the data

8  provided by Petitioner in this regard presents only an "attenuated risk" for at least two reasons.

9        First, Plaintiff's eighty percent statistic appears misleading, because reversal rates for

10  individual years or even multiple years occurring between 1991 and 2003 deviated dramatically.  For

11  example, in 1996 and 1997, the governor reviewed a total of forty grants for the two year period, but

12  reversed the earlier grant on only three occasions.  (Pet's Lodged Doc. 103, Exh. 3.)  Perhaps even

13  more relevant is the data for 2004, the year that the Governor reversed Petitioner's grant of parole at

14  issue here.  In 2004, the Governor reviewed 225 grants but reversed 128 times, and sent back an

15  additional 18 grants for further review by the Board.  (Id.)  Ignoring the 18 grants sent back for further

16  review, (which do not appear to have resulted in subsequent reversals), the data reflects a rate of

17  reversal of just over 56 percent, (Id.), a rate which the Court finds unpersuasive.

18        Second, the record reflects that the Parole Board considered Petitioner's release or continued

19  confinement on numerous occasions reaching several different results over nearly a twenty year

20  period.  As early as 1990, the Parole Board found Petitioner suitable for parole, but later scheduled a

21  rescission hearing and concluded that the decision should be rescinded.  As noted earlier, at five

22  subsequent hearings, between 1993 and 2001, Petitioner was found unsuitable for parole.  (Resp't

23  Lodged Doc. 104, Exhs. P-T.)  When the Parole Board reconvened in 2003 it found Petitioner

24  suitable, and but then Governor Davis reversed the Board's decision.  (Doc. 1 at 5.)  Just one year

25  later, in 2004, the Parole Board found Petitioner suitable for parole, but this time former Governor

26  Schwarzenegger reversed the Board's decision.  (Doc. 1 at 12.)  Following this reversal, between

27  2005 and 2007, the Parole Board at two subsequent hearings, found Petitioner unsuitable for parole.

28  (Resp't Lodged Doc. 104, Exhs. Y&Z.)  Finally in 2008, the parol board granted Petitioner's release

1 and the Governor declined to review the parole board's decision.  (Doc. 29 at 2.)  This history, and

2 particularly those parole board determinations made after 2001, do not demonstrate, as Petitioner

3 contends, that Petitioner was the "ideal parole candidate," but instead reflect the difficulties decision

4 makers faced (either the Parole Board or the Governor) when evaluating the objective and inherently

5 subjective factors used to determine whether Petitioner would be suitable for parole.

6        In light of this discussion, the Undersigned finds that Petitioner has demonstrated no more

7 than an "attenuated" or "speculative" possibility of a prolonged incarceration with his applied ex post

8 facto challenge of Article V, section 8(b).  Garner, 529 U.S. at 251.  Accordingly, the Court finds that

9 Petitioner is not entitled to habeas corpus relief on this ground.

10 **IV.    Conclusion**

11                                          **ORDER**

12     1.      Respondent's motion in limine as to Petitioner's Exhibits 14, 15, and 21 is granted;

13             and

14     2.      Respondent's request to strike Petitioner's Exhibit 24 is granted.

15

16                                    **RECOMMENDATION**

17        Accordingly, the Court RECOMMENDS that:

18     1.      The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

19     2.      The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

20        This Findings and Recommendation is submitted to the Honorable Lawrence J. O' Neill ,

21 United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

22 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

23 Within thirty (30) days after being served with a copy, any party may file written objections with the

24 court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

25 ///

26 ///

27 ///

28 ///

1   Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within

2   fourteen (14) court days after service of the objections.  The Court will then review the Magistrate

3   Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file

4   objections within the specified time may waive the right to appeal the District Court's order. Martinez

5   v. Ylst, 951 F.2d 1153 (9th Cir.1991).

6          IT IS SO ORDERED.

7      **Dated:    December 19, 2011**              **/s/ Dennis L. Beck**
                                           UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28